IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JERRY OSBORNE,

                    Plaintiff,                            **8:14CV20**

          v.

CAROLYN W. COLVIN, Acting                        **MEMORANDUM AND ORDER**
Commissioner of Social Security; and
ERIC HOLDER JR.,

                    Defendants.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("SSA"). Filing No. 1. Jerry Osborne appeals the final determination denying his application for Social Security benefits under Title XVI of the Social Security Act. 42 U.S.C. §§1381 *et seq.* This court has jurisdiction under 42 U.S.C. §405(g) and 42 U.S.C. §1383(c)(3). Upon review of the record, this court concludes that the decision of the Administrative Law Judge ("ALJ") denying benefits is not supported by substantial evidence. Accordingly, the decision of the ALJ, and thereby the Commissioner, is reversed.

### I. BACKGROUND

On June 3, 2011, claimant Jerry R. Osborne ("Mr. Osborne") filed an application for Supplemental Social Security Income under Title XVI of the Social Security Act. Filing No. 9-5, Social Security Transcript ("Tr.") at 128. In this application, he alleged that he was disabled as a result of post-traumatic stress disorder ("PTSD") and depression with an onset date of disability on September 30, 2004. Filing No. 9-6 at 175. Additionally, on June 3, 2011, Mr. Osborne also filed an application for Disability Insurance Benefits under Title II of the Social Security Act, alleging the same onset date

of disability, that of September 30, 2004. Filing No. 9-5. Both claims were denied initially on August 12, 2011, and again upon reconsideration on November 16, 2011, for lack of medical basis. Filing No. 9-2; Filing No. 9-4. In response to these denials, Mr. Osborne requested and was granted a hearing with the ALJ on November 5, 2012, at which he amended his alleged onset date of disability to May 24, 2011, and effectively dropped his Title II claim. Filing No. 9-2. Following the hearing at which a vocational expert also testified, the ALJ denied the claim for benefits. *Id.* On November 22, 2013, the Social Security Administration denied Mr. Osborne's request for a review of the ALJ's decision. *Id.*

**A. Factual History**

Jerry Osborne is now a 39-year-old resident of Omaha, Nebraska. He obtained his GED in 1991 and has had no specialized job training, trade, or vocational schooling. Past work history for Mr. Osborne includes telephone solicitor, hotel desk clerk, laundry worker, cleaner, and hotel auditor. Mr. Osborne's last period of substantial gainful activity was in 2003, although he did work as a temporary laborer from 2005 to 2006 two days a week, and again in August 2008 for a period of three days until he was terminated with an accusation of sexual harassment of a coworker. At his ALJ hearing on November 13, 2012, Mr. Osborne contended that he was unable to work due to a combination of mental impairments that caused him to feel as though he was "being judged no matter what [he was] doing or how [he was] doing anything." Filing No. 9-2. As a result, Mr. Osborne found it very difficult to be around people and noted that it was hard to keep to himself at any job. *Id.*

Mr. Osborne grew up in Omaha, Nebraska, and various small towns in Iowa. He is the oldest of six siblings, but has no contact or relationship with either them nor his parents. Mr. Osborne related significant physical and mental abuse as a child, but denied any sexual abuse. As a result of this abuse, he was placed into foster care at ages 4, 8, 11, and 12, but was returned to his mother each time.

Mr. Osborne reported that he attended several different elementary schools due to multiple placements throughout Omaha, Missouri Valley, and Council Bluffs. He stated that he repeated second grade and then dropped out of school in ninth grade and subsequently completed his GED. Mr. Osborne has never married but does have three children. He indicated that his three children were given up for adoption by his wife. He further reported that he no longer has contact with them, as they have been adopted by a family in Iowa that does not respond to his requests for contact.

Mr. Osborne has been arrested twice, once for domestic abuse and once for excessive discipline of a child. He indicated that he was accused of child abuse in 2004 for attempting to control a child by holding him still. As a result, Mr. Osborne attended court-ordered anger management therapy, which led to his first treatments for PTSD.

At the time of his application, Mr. Osborne was living in an apartment with his girlfriend, Juanita Trudell, and had been for approximately a year and a half. Prior to this, he had been homeless. Mr. Osborne related that his longest period of employment was two and half years, which ended when the motel he was working at closed. Previous experience included work in factories and hotels in shuttle service, security, bell hop, desk clerk, and auditor positions. Mr. Osborne related that the reason that he moved from job to job was "due to people." Mr. Osborne indicated, however, that he

3

had been fired twice for sexual harassment, and once for failing a drug test when the presence of THC was detected in his system.   Additionally, he stated that he was currently unable to obtain new work at that time because he was always told that girls bring in the business or that he was overqualified for the position.

Additionally, Mr. Osborne has a long history of substance abuse.  He also reports a family history of alcoholism.   He first tried marijuana at age 5 and began using regularly at age 14.  He reported using as much as he could from age 17, and although he has had periods of abstinence from the drug, he still continues to use when he is able to obtain it.  He reported one such period from 2000 to 2004, but indicated that when he was not using he became irritable.   There is no report of substance abuse treatment at any time.  Mr. Osborne did state that when he had a job, his rent, utilities, food and cigarettes were paid for first, and that if he couldn't buy cigarettes, then he couldn't buy marijuana.  He reported that he did have a period of amphetamine use from 1997 to 1999, but that he quit using on his own because he "didn't like the way [he] was on meth."   Mr. Osborne reports having tried other drugs including cocaine, LSD, and alcohol, but reports few incidences and no current use.

In his applications for disability, Mr. Osborne stated that he did not go out to visit others and had no social activities, did not talk to his family, and never affiliated with his coworkers.  Mr. Osborne stated that he did engage in cooking twice a week, washed dishes when they piled up and assisted with dusting when it was thick.  He did not engage in outside yard work (although this may not be indicative of anything as he lived in an apartment where he was not responsible for such work) and did not supervise or assist in supervising any children.  Mr. Osborne reported that he did not have a valid

driver's license and instead either walked or a friend drove him to where he needed to go.  *Id.*  He stated that he did leave the apartment every few days to walk to the gas station for cigarettes.

Mr. Osborne reported that he generally spent his days playing video games alone, watching comedy T.V., or reading.  He did indicate that he had two friends with whom he occasionally played video games, and he also indicated that he played video games with his girlfriend, walked around with her, and just relaxed with her.  He stated that he did not take naps during the day, but had trouble sleeping and would read for up to 7 hours before being able to fall asleep.  He also reported that he liked to walk, but that his girlfriend became paranoid when he went out and accused him of cheating. He indicated that he is never alone.  Mr. Osborne reported anxiety reactions in which he felt as though he was being judged and getting dirty looks when grocery shopping, clothes shopping, or standing in long lines.  He stated that these reactions appeared when he was around big crowds, lasted for a couple hours, and improved only when he was able to get away from the crowd.

As a result of his illness, Mr. Osborne reported that he did not want to meet new people nor was he able to trust anyone. He also reported that his lack of work and constant rejection when applying for work added to his depression.  Additionally, Mr. Osborne reported that due to his anxiety he was no longer able to go out to parks, indoor or outdoor concerts, shopping, or out to eat.   Mr. Osborne's girlfriend also reported that he did not bathe as often as he used to and was in need of new clothes.

Upon review of Mr. Osborne's medical records, Dr. Gerald Spethman, M.D., found that Mr. Osborne did not have any severe physical issues and that none were

alleged. Filing No. 9-7.  This was confirmed by Dr. Jerry Reed, M.D., on November 15, 2011 with a notation that there were no new physical allegations, limitations, or treatments.  *Id.* There is no dispute in this fact.

In his original disability report, Mr. Osborne listed his mental conditions as PTSD and Depression and stated that these conditions caused him pain or other symptoms. Filing No. 9-6. He first sought mental health treatment for these conditions in 2004 when he received court ordered anger management therapy in relation to an allegation of child abuse.  Filing No. 9-6; Filing No. 9-7. On October 29, 2004, services were initiated at the Institute for Therapy and Psychological Solutions, LLC in Council Bluffs, Iowa, with El Siebert, LISW.  Filing No. 9-6.  The initial referral listed problems including "Re-experiencing flashbacks and dreams of his own victimization as a child. Anger problem." Filing No. 9-7.  Mr. Osborne's treatment plan diagnosis was Adjustment Disorder with Disturbance of Conduct and a GAF score of 65 was listed, along with a diagnosis of Prolonged Post Traumatic Stress Disorder.[1]  *Id.* at 251, 253.  Siebert created a treatment plan on January 5, 2005, for the presented problem of anger, and a second treatment plan for a presented problem of "intrusive thoughts/dreams, flashbacks of childhood abuse experienced at the hands of his step-dad."  *Id.* at 248, 253.  In these plans, Siebert recommended eight to twelve individual therapy/cognitive behavioral sessions for anger management and, to meet the listed goals of reducing and

---

[1] The Global Assessment of Functioning ("GAF") Scale is a rating system for reporting a clinician's judgment of an individual's overall level of functioning, not including physical impairments or environmental limitations. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000) ("DSM-IV-TR"). A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV-TR at 34.  In the most recent publication of the American Psychiatric Association, the DSM-5, the GAF scale is no longer used.

eliminating the negative impact of trauma and developing and implementing effective coping skills that promote healing and acceptance of the past, 18 sessions of Behavioral/Cognitive therapy.  *Id.* at 252, 254.  Siebert stated that the desired outcome from these sessions was "to eliminate all inappropriate anger behaviors."  *Id.* at 252.

Mr. Osborne dropped out of therapy with Siebert on December 21, 2005.  *Id.* at 248.  The final report includes statements from Siebert that Mr. Osborne met his goal of "increasing ability to express anger appropriately," but he failed to "reduce or eliminate negative impact of trauma."  *Id.* at 248, 312.  This was recorded as a good response to treatment for anger, but a fair response for the PTSD problem.  *Id.* at 248.  Mr. Osborne's discharge diagnosis was Prolonged PTSD with a GAF score of 65 and he was not prescribed any medications.  *Id.* at 249.  Aftercare/Follow-up was listed in the report as necessary, but Siebert noted that Mr. Osborne did not respond to letters indicating such.  *Id.*  Siebert also made further recommendations for individual therapy and medications evaluation to assess for PTSD.  *Id.* at 250.

Subsequent to filing his original application for disability, Mr. Osborne was examined on July 5, 2011 by Dr. A. James Fix, Ph.D., after a referral by the Disability Determination Services of the State of Nebraska, Department of Education, Division of Rehabilitation Services, with the specific purpose of determining disability status.  *Id.* at 277.  Dr. Fix reported that Mr. Osborne's behavior during the interview was very bizarre and difficult to deal with.  *Id.*  Mr. Osborne was observed to be very intense in all of his expressions and easily prone to anger.  *Id.*  Dr. Fix noted that once Mr. Osborne started talking and trying to make his point, he refused to be stopped while trying to convey it,

regardless of whether the statement had anything to do with the question asked.  *Id.*
Mr. Osborne was also noted to be very overly dramatic.  *Id.*

Mr. Osborne related to Dr. Fix that his disability was PTSD and that he had
trouble being around people.  *Id.* at 277.  He further stated that he "felt people staring at
him," he heard voices in his head, and he was convinced that people were talking about
him. *Id.* at 278.  Mr. Osborne reported that these delusions had existed his entire life.
*Id.* at 279.  He also stated that he lost track of conversations and that he had "anger
outbursts" that resulted in quitting jobs.  *Id.* at 278, 279.

Dr. Fix stated that throughout the interview, Mr. Osborne remained alert and
responsive, albeit very unusual in his presentation.  *Id.* at 279.  Dr. Fix also reported that
Mr. Osborne was very irritable overall, with shifts from responsibly calm to overtly angry.
*Id.* Responses were intense, rapid, and obsessive at times, but clear and adequately
formed with no psychotic disorganization.  *Id.* at 280.  Additionally Dr. Fix noted that Mr.
Osborne appeared not to recognize that his behavior was bizarre or inappropriate.  *Id.*
At the review by Dr. Fix, Mr. Osborne was oriented in all spheres, but did state that the
voices in his head told him who was talking about him.  *Id.*  His memory was tested and
he was determined to be of at least average intelligence with a past ability to work at a
level of average intelligence for periods of time, but not continuously.  *Id.*

Mr. Osborne reported to Dr. Fix that he lived with his girlfriend who was disabled
due to bipolar condition.  *Id.*  Mr. Osborne stated that his daily routine involved getting
up at 9:00 a.m. to have coffee and to smoke, chat with his girlfriend, and call an ill friend
who was in a care facility.  *Id.*  He stated that primarily he spent the day playing video

games and then went to sleep between 2:00 a.m. and 4:00 a.m., sleeping for no more than five hours.  *Id.*  He reported that he never slept as long as he wanted to.  *Id.*

As a result of their interview, Dr. Fix reported that "this claimant is very mentally ill, but is either in denial or he does not know it.  He does not seem to recognize how inappropriate, strange, and unusual his behavior is, and it is explosive and potentially dangerous at times."  *Id.* at 281.  Further, Dr. Fix stated that "the claimant does need treatment, and I see no improvement in his condition without it."  *Id.*  The diagnosis given was Schizoaffective Disorder and Probable Posttraumatic Stress Disorder with a current GAF of 30 and highest at 40.[2]  *Id.* Mr. Osborne was found to engage in no goal-directed activities, show explosive behaviors and anger outbursts, and have a great deal of trouble in any social situation.  *Id.*  Dr. Fix noted that when under stress, Mr. Osborne became delusional and withdrew.  *Id.*  He noted that Mr. Osborne was able to understand short and simple instructions, but had difficulty sustaining concentration and attention.  *Id.*  Dr. Fix stated that he supposed "that there may be some conditions in which the claimant could work under ordinary supervision, but I think that his explosiveness would make this really difficult."  *Id.*  Although Dr. Fix felt that Mr. Osborne was able to adapt to changes in his environment, he also noted that Mr. Osborne had difficulty relating to other people, particularly in groups.  *Id.*  Additionally,

---

[2] A GAF score of 21 to 30 indicates that behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). DSM-IV-TR at 34.  A GAF score of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.*

Dr. Fix noted that, "strangely, the claimant does seem capable of handling his own finances." *Id.* at 282.

The SSA requested a Medical Consult Assistance – Adult Mental review of Mr. Osborne's allegations of PTSD and depression. *Id.* at 283. A specific request was made to assess the consultative examination ("CE") done by Dr. Fix, which showed schizoaffective disorder and probable PTSD. *Id.* In its request, however, the SSA noted that the presentation appeared rather like Anti-Social Personality Disorder. *Id.* In response to this request, on July 19, 2011, Dr. Christopher Milne, Ph.D., completed a Psychiatric Review Technique ("PRT") for Mr. Osborne based on Dr. Fix's July 7, 2011 examination and July 10, 2011 report. *Id.* at 285. Dr. Milne assessed a medical disposition of "Impairment(s) Severe But Not Expected to Last 12 Months," and "Insufficient Evidence for Daily Living Index as of 3/31/08," based upon conditions including Affective Disorders and Anxiety-Related Disorders. *Id.* For both groups of disorders, Dr. Milne listed the justification as "a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." *Id.* at 288, 290. At that time, Dr. Milne found no restrictions on activities of daily living, no difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. *Id.* at 295. Dr. Milne found that Mr. Osborne had moderate difficulties in maintaining social functioning. *Id.* None of these findings, however, met the degree of limitation required to satisfy the functional criterion for disability. *Id.* Dr. Milne further noted that, via third-party reporting, Mr. Osborne prepared some meals, visited a few friends, completed household chores, read, was nervous in groups, played video games and fished. *Id.* Milne noted that Mr. Osborne

himself reported that he prepared some meals and completed household chores, and that he additionally reported that he had no visits or social activities, ran errands, watched television, and managed money.  *Id.*  Dr. Milne concluded his report by stating that the estimated GAF of 30 indicated a major impairment in overall functioning, but that although Mr. Osborne's condition was severe, it was not expected to last 12 months.  *Id.* at 297.

Dr. Milne also completed a Mental Residual Functional Capacity Assessment ("RFC") for Mr. Osborne again based on Dr. Fix's July 5, 2011 CE, noting the onset date of disability as July 5, 2011.  *Id.* at 300.  In his report, Dr. Milne stated that Mr. Osborne was Moderately Limited in "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "the ability to work in coordination with or proximity to others without being distracted by them," "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "the ability to interact appropriately with the general public," the ability accept instructions and respond appropriately to criticism from supervisors," and "the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes."  *Id.* at 300, 301.  He also stated that Mr. Osborne had been found by Dr. Fix to show intact attention/concentration, but also to have demonstrated anger, irritability, and bizarre behaviors.  *Id.* at 302.  Dr. Milne stated that with the given diagnosis and symptoms, Mr. Osborne would improve with medication and treatment compliance.  *Id.*

11

On September 6, 2011, Mr. Osborne reported to Catholic Charities Behavioral Health Outpatient Services for a three-hour Mental Health Evaluation with Alberta L. Vasarkovy, LIMHP, LADC.   (Licensed Independent Mental Health Practitioner, and Licensed Drug and Alcohol Counselor) *Id.* at 330.   At that evaluation, Mr. Osborne reported that he was seeking treatment because he thought that he was "going out of [his] mind."   *Id.*   He indicated that he felt okay when he woke up, but that he became irritable and his brain would not stay on one thing for very long.   *Id.*   Mr. Osborne also reported that he was not able to sleep for more than a few hours at night, and was not able to concentrate on a book when he tried to read.   *Id.*   He also made reference to the voices that he heard, stating that they were "consistent and critical sounding toward others."   *Id.* at 335.   His final complaint was that "thoughts come from nowhere about [his] past."   *Id.* at 330.   Mr. Osborne indicated that he had used marijuana three times in the seven days preceding his appointment and would have used again that morning if he had any.   *Id.* at 331.

Vasarkovy also noted that during the interview Mr. Osborne was both coherent and congruent, and that there did not appear to be indications of hallucinations, unusual preoccupation with somatic complaints, obsessive thoughts, or compulsive behavior. *Id.* at 334.   His attention span was noted to be limited, he paced often, and often needed redirection to move from a tangent back to the original topic.   *Id.*   Mr. Osborne was also noted to be very agitated, demonstrative and loud in his descriptions.   *Id.* at 335.   Vasarkovy further stated that it appeared that Mr. Osborne found it difficult to respond in clear succinct statements.   *Id.*   Vasarkovy diagnosed Mr. Osborne with Major

Depression, Severe with Psychotic features and Cannabis Dependence with a GAF score of 40. *Id.*

On September 14, 2011, Mr. Osborne participated in a two-and-a-half-hour diagnostic interview from Kathleen Langdon, PMHNP-BC (Board Certified Psychiatric Mental Health Nurse Practitioner), at Catholic Charities. *Id.* at 312. She reported that at the interview Mr. Osborne stated that his chief complaints were that he could not stay asleep at night, he relived childhood trauma while asleep, he was very irritable, his anxiety level was high, and he never felt well rested. *Id.* Mr. Osborne reported six previous suicide attempts, and that his first thoughts of suicide were at age 9. *Id.* Langdon noted that Mr. Osborne had clean and combed hair, clean clothes that were in good repair and were appropriate to the situation/weather, and that his behavior was cooperative and he made appropriate eye contact. *Id.* at 317-318. She stated that Mr. Osborne's told a story for every question asked, was very difficult to interrupt, and was quite distractible. *Id.* at 318. She noted that he was animated, and at times loud and dramatic, as well as hyper-vigilant. *Id.* at 318, 320. His thoughts appeared logically coherent and goal directed, albeit over-inclusive with an overabundance of ideas. *Id.* at 318. He reported that his mood was "just there" and that his current depression level was a 4, his anxiety was a 4-5, and that he had 6-7 panic attacks in the last month. *Id.* Within the two weeks prior to the interview, Mr. Osborne reported that he suffered from depression, anhedonia, insomnia, psychomotor agitation, loss of energy, worthlessness and guilt, difficulty with making decisions, and passive suicide ideation. *Id.* Mr. Osborne reported a variety of thoughts, including: obsessions/intrusive thoughts, dissociation, worrying, flashbacks/nightmares, compulsions, paranoia, phobias (e.g.

13

spiders), hallucinations (both auditory and visual), irritability, delusions, suicide, feelings of influence in which he thinks random people can read his mind, self-abuse (beginning at age 8), and homicide (specifically towards his mother's boyfriend).  *Id.* at 319-320.

In her assessment, Langdon related that Mr. Osborne was currently looking for work after having been denied Social Security Disability for PTSD.  *Id.* at 322.  Mr. Osborne reported many years of mistreatment by others and strong frustration at not being able to find a job.  *Id.* at 321.  In fact, according to Langdon, he suffered significant physical, sexual, and emotional abuse at the hands of his mother's boyfriend and was not protected by his mother.  *Id.* at 322.  Langdon diagnosed Mr. Osborne with PTSD; Bipolar II Disorder with rule out Psychosis not otherwise specified, Bipolar I Disorder, Schizoaffective - Bipolar Type, and Dissociative Disorder not otherwise specified; Generalized Anxiety Disorder; Obsessive Compulsive Disorder; Specific Phobia – Spiders; Cannabis Dependence – actively using; Amphetamine Dependence in full sustained remission; and Nicotine Dependence; along with a rule out axis II diagnosis of Cluster B Personality Disorder – antisocial, borderline, narcissistic and assigned a GAF score of 50.[3]  *Id.* at 322.  Langdon started Mr. Osborne on Geodon at that time.[4] *Id.*

On September 18, 2011, Mr. Osborne was seen in the emergency room for possible medicine reaction/possible adverse reaction to Geodon.  *Id.* at 323.  He presented with symptoms of right arm tingling and feelings that he could not stop

---

[3] A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM IV-TR at 34.

[4] Geodon (ziprasidone hydrochloride) is a medication prescribed for treatment of schizophrenia or acute treatment of manic or mixed episodes associated with bipolar I disorder. It is adjunct to lithium or valproate for maintenance treatment of bipolar I disorder. *Physician's Desk Reference.*

moving his arm.  *Id.*  He was diagnosed with akathisia[5,] and given Cogentin tablets with instructions to return if the symptoms persisted.[6]  *Id.*

On November 8, 2011, Langdon completed a Mental Residual Functional Capacity Assessment for Mr. Osborne.  Filing No. 9-7 at 341.  She found him to be Moderately Limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to work in coordination with or proximity to others without being distracted by them, the ability to interact appropriately with the general public, and the ability to respond appropriately to changes in the work setting.  *Id.* at 341, 342.  Additionally, she found Mr. Osborne Moderately Limited to Markedly Limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and the ability to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  *Id.* at 342.  Further, she found him Markedly Limited in the ability to maintain attention and concentration for extended periods, and the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  *Id.* at 341.

---

[5] Akathisia is a syndrome characterized by an inability to remain in a sitting posture, with motor restlessness and a feeling of muscular quivering; may appear as a side effect of antipsychotic and neuroleptic medication. Stedman's Medical Dictionary 11060 (27th ed. 2000).

[6] Cogentin (benztropine mesylate) is used to treat all forms of parkinsonism and to control extrapyramidal disorders due to neuroleptic drugs. *Physician's Desk Reference.*

On November 16, 2011 a second Psychiatric Review Techniques Form based on available medical record was completed by Dr. Patricia Newman, Ph.D. *Id.* at 349. Dr. Newman stated that the additional records received after Dr. Milne's July 2011 Psychiatric review showed brief treatment for PTSD and that the client was currently actively seeking treatment and taking medications. *Id.* at 350. Under Medical Dispositions, she checked the boxes indicating that Mr. Osborne had impairment(s) that were severe but not expected to last 12 months, stating that she believed his symptoms were expected to improve with medication adjustment, and the box indicating that the record contained insufficient evidence. *Id.* at 349, 350. Further, Dr. Newman stated that Mr. Osborne should be able to do simple unskilled work by July of 2012. *Id.* at 350. She also noted that her disposition was based on affective disorders and anxiety-related disorders, and that her findings completed the medical portion of the disability determination. *Id.* at 349. Dr. Newman reported that the initial PRTF/MRFC of July 19, 2011, was consistent with the updated records and therefore she affirmed Dr. Milne's findings. *Id.* at 349, 350.

From September 2011 to September 2012, Mr. Osborne continued to see Langdon at Catholic Charities. Filing No. 9-7 at 328-329; Filing No. 9-8 at 351-366. The last Catholic Charities evaluation was Sept. 11, 2012. Osborne's diagnosis was still substantially unchanged: PTSD, Bipolar II Disorder with symptoms consistent with Psychosis NOS, Bipolar I Disorder, Schizoaffective – Bipolar Type and Dissociative Disorder NOS. He also had a GAF of 55 which was consistent with the highest score he received in any of his prior visits. He still had no job and reported difficulty finding one. Filing No. 9-8 at 351-353.

In answers to interrogatories, Mr. Osborne indicated that he was currently unable to work due to Bipolar Disorder and PTSD. Filing No. 9-6 at 228. He stated that due to these conditions "interpersonal interactions are hard," and due to recurring flashbacks he had the "tendency to zone out and not pay attention to anything around [him] when they're happening." Id. He reported that his current medications at the time of the interrogatory (October 11, 2012) were Trazadone and Abilify. Id. He admitted that he does go grocery shopping once a month, but tried to get it out of the way as fast as possible. Id. at 231. Mr. Osborne reported that he got up between 7 a.m. and 9 a.m., took a nap after dinner, and then went to bed (but not necessarily to sleep) between 9:30 p.m. and 11:30 p.m. Id. at 233.

On November 5, 2012, Mr. Osborne testified at a hearing before ALJ Kathleen Muramoto. Filing No. 9-2. At this hearing, Mr. Osborne, through his attorney, amended the alleged onset date of disability to May 24, 2011, which effectively precluded the Title II claim. Id. Mr. Osborne was represented by Jenna Kessell, who presented information that Mr. Osborne had an effective date of disability of May 24, 2011, and that he suffered from a combination of mental impairments that made him unable to work including schizoaffective disorder, bipolar disorder type II, and PTSD. Id. Kessell argued that Mr. Osborne displayed severe symptoms and severe limitations, and that even though improvement was noted between his initial evaluation with Dr. Fix and his final appointment notes with Langdon, he had not improved to the point in which he could return to work because his condition, including significant anxiety, was still severe at the time of the hearing.

At the hearing, Mr. Osborne testified that he had been seeing a Dr. Bert[7] for counseling and that he was currently taking Citalopram,[8] Trazodone, and Abilify. He reported that he was leery of meeting new people, it was hard to keep to himself when working, and it was "just really difficult to be around people anymore," because he felt that he was always being judged. *Id.* at 33, 34. Mr. Osborne related that he rarely drank alcohol, that he smoked cigarettes and that he smoked marijuana every few weeks. *Id.* at 34, 35. When he needed transportation to an appointment, Mr. Osborne either used a bus pass from Catholic Charities or got a ride from a friend. *Id.* at 35. He testified his typical day involved getting up between 6:30 a.m. and 7:30 a.m., feeding his and his girlfriend's two cats, having a bit of coffee, playing a few video games, fixing dinner, watching TV, and then going to bed. *Id.* at 35. Mr. Osborne stated that he was able to complete self-care activities when on medication, but that he needed to be reminded at least two or three times a week to shower, brush his teeth, or put on deodorant. *Id.* at 36, 42. He also stated that he helped with household chores such as the dishes, mopping the floor, washing the stove off, vacuuming, sweeping, and laundry, but that he had issues with dusting and did not clean the bathroom. *Id.* at 36, 37. Mr. Osborne testified that once a month with his girlfriend he went to the grocery store, in the middle of the night when there were fewer people, and he went to the gas station every few

---

[7] Both Mr. Osborne and Kathleen Langdon reference Dr. Bert as a treating mental health practitioner that Mr. Osborne was seeing at Catholic Charities concurrently with Langdon. There is, however, no reference by the ALJ made to medical evidence obtained from Dr. Bert nor are there any treatment notes from Dr. Bert found in the record.

[8] Citalopram is a Selective Serotonin Reuptake Inhibitor. *Physician's Desk Reference*. There are two forms of the drug which Mr. Osborne could be referring to in this statement. Celexa (citalopram hydrobromide) is used to treat depression, and Lexapro (escitalopram oxalate) is used for the acute maintenance treatment of major depressive disorder in adults and adolescents and for the acute treatment of generalized anxiety disorder.

days for cigarettes. *Id.* at 37, 39.  Mr. Osborne stated that he had very few friends, whom he saw once or twice every couple of weeks.  *Id.* at 38.  He stated that he did not read anymore because he was unable to concentrate on a book because his mind wandered. *Id.* at 38.  Mr. Osborne stated that once in a while he and his girlfriend went for a walk, but that they did not go out to establishments.  *Id.* at 39.  He stated that he did not get regular exercise and that he did not take his cats to the vet.  *Id.* at 39.  Mr. Osborne also stated that he had had hallucinations for as long as he could remember. *Id.* at 41.  He testified that once or twice every couple of weeks, he still thought he saw someone out of the corner of his eye.  *Id.*  He stated that his anxiety level was at 7 when he was at home, but went up to 9 when he had to leave.  *Id.* at 42.  He reported that the Trazodone helped him to sleep and that when he was on the medication he got about six to eight hours at night.  *Id.* at 44.  He stated that this was an improvement in that, prior to the Trazodone, his sleep was erratic and he was lucky to get six hours. *Id.* at 44.

Vocational Expert ("VE") Anita Howell also testified at the hearing.  Howell stated that Mr. Osborne's past relevant work history included telephone solicitor, a sedentary, semiskilled job; hotel desk clerk, light, semiskilled job; hotel laundry worker, medium, unskilled job; cleaner, heavy but medium as performed, unskilled job; and hotel auditor, sedentary but performed as light, skilled job.   Howell was then asked a series of hypotheticals about potential jobs that Osborne could perform.  *Id.* at 46-49.  The ALJ first asked the VE to assume an individual with Mr. Osborne's age, educational level, and work history with no physical limitations; and the ability to understand, remember, and carry out very short and simple instructions under ordinary  supervision; ability to maintain attention and concentration for task completion; ability to sustain an ordinary

routine without special supervision; ability to make simple work-related decisions; ability to interact adequately with coworkers and supervisors; and should have no more than superficial contact with the general public. *Id.* at 46, 47. Howell stated that such an individual could perform past work as a laundry worker and cleaner, as well as other positions such as linen room attendant, warehouse worker, and order picker. *Id.* at 47. Mr. Osborne's representative asked the VE to assume all of the above specifications except that the individual would not have the ability to sustain attention or concentration or task completion and would not be able to work under ordinary supervision. *Id.* at 48. The VE stated that such an individual would not be able to perform any of his past work. *Id.* at 48. Next, citing the RFC created by Langdon, Osborne's representative asked the VE to assume a person with the same attributes as in the ALJ's hypothetical, but with a markedly limited ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number of rest periods, accept instructions, and respond appropriately to changes in the work setting, get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness would be able to perform their past work. *Id.* at 48 to 49. Howell answered that "there would be no jobs such a person could perform." *Id.* at 49.

### B. ALJ's Findings

The ALJ found that Mr. Osborne had severe impairments of schizoaffective disorder, bipolar disorder II, and PTSD, which "interfere more than minimally with the claimant's ability to perform basic work-related functions". *Filing No. 9-2* at 14. According to the ALJ, none of Osborne's severe impairments met or equaled any of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix I. That finding was based on Osborne's failure to establish that he met the criteria of "paragraph B," which requires at least two of the following to occur: marked (more than moderate but less than extreme) restriction of activities in daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated (at least three within one year) episodes of decompensation, each of extended duration (lasting at least two weeks). *Id.* at 15.

The ALJ found that he had moderate difficulties in social functioning, with limitations of no more than superficial contact with the general public. *Id.* Additionally, the ALJ found that there were no difficulties in concentration, persistence, and pace that would prevent unskilled work. *Id.* There were no indicated periods of decompensation, neither in sufficient duration nor frequency. *Id.* Further, the ALJ determined that the criteria of "paragraph C" were also not met because there were no repeated episodes of decompensation, Mr. Osborne would not decompensate with even a minimal increase in mental demands, and he had not required a highly supporting living arrangement for at least one year. *Id.*

The ALJ considered the symptoms presented through the medical evidence and made a determination that Mr. Osborne had a residual functional capacity to perform work at any level of exertion. *Id.* at 16. No physical limitations were found. *Id.*

Although the ALJ noted that Mr. Osborne should have no more than superficial contact with the general public, Mr. Osborne was found to be able to carry out short and simple instructions, require ordinary supervision, maintain attention and concentration for task completion, sustain an ordinary routine, make simple work-related decisions, and interact adequately with supervisors and coworkers. *Id.* at 16. To make these findings, the ALJ followed a two-step process of first determining whether or not there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. *Id.* at 16. The ALJ found the existence of this criteria. *Id.* at 17. Second, the ALJ evaluated the extent to which the intensity, persistence, and limiting effects of the claimant's symptoms actually limited the claimant's functions. *Id.* at 16.

To evaluate the intensity, persistence, and limiting effects of Mr. Osborne's symptoms, the ALJ relied primarily on the reports from Catholic Charities and Mr. Osborne's testimony at his hearing. *Id.* at 16. The ALJ focused on statements that Mr. Osborne helps with chores around the house and plays video games with friends once every two to three weeks to show that Mr. Osborne may concentrate for extended periods of time. *Id.* at 16-17. The ALJ stated that because Mr. Osborne had hallucinations for "as long as he could remember" and had been gainfully employed in the past, the hallucinations did not present any work-related limitations. *Id.* at 17. The ALJ also stated that the record indicated that Mr. Osborne was uncomfortable around groups of people, but that he was able to function adequately with his girlfriend and small group of friends, as well as tolerate people when riding the bus, grocery shopping, and walking to a nearby gas station. *Id.* at 17.

The ALJ noted that Mr. Osborne was able to sit through the hearing, track appropriately, and answer all questions appropriately. *Id.* at 17. The ALJ also noted that recent counseling records had indicated improvement in Mr. Osborne's mental health. *Id.* at 17. Based on the activities discussed above, the recent mental health records, and Mr. Osborne's presentation at the hearing, the ALJ determined that there was no support for a finding of disability. *Id.* at 17. She found the statements that Mr. Osborne made regarding intensity, persistence, and limiting effects not credible because they were inconsistent with the residual functional capacity assessment. *Id.* at 17. The ALJ gave great weight to the agency's initial denial, stating that the opinions of Dr. Milne and Dr. Newman were consistent with each other and constituted substantial medical evidence. *Id.* at 17.

Based on Dr. Milne's analysis, the State agency determined that Mr. Osborne's condition was severe and did keep him from working, but that the condition was not expected to last 12 months. *Id.* at 18. According to the ALJ, the additional medical evidence presented after the agency's initial determination supported its conclusion, with notes from Langdon showing marked improvement. *Id.* at 18. The ALJ found that Mr. Osborne showed consistent and continuing improvement in condition through the course of nine visits over a twelve-month period and an improvement in GAF score from 50 to 55. *Id.* at 18. However, because the observations made by the ALJ at the hearing were inconsistent with its findings, the ALJ did not give great weight to the RFC completed by Langdon on November 8, 2011, that found Mr. Osborne markedly limited in several areas of work-related function. *Id.* at 18. It was also noted that the RFC was compiled in November and that the treatment notes taken into account were mostly

23

generated after that date.  *Id.* at 18.  Importantly, the ALJ also discounted the report of Dr. Fix from July 5, 2011; however, the ALJ did admit that the state agency had based its original denial upon this report. *Id.* at 18.  The ALJ found then that the 12-month durational requirement was not met. *Id.* at 18.

The ALJ recognized that Mr. Osborne still did not want to leave his apartment, felt as though others were watching him, and paced while speaking as of his September 11, 2012, appointment with Langdon.  *Id.* at 19.  Further it was noted that Mr. Osborne had not yet completely overcome his discomfort in social situations.  *Id.* at 19. However, the ALJ relied on Langdon's September progress notes that indicated that Osborne had a good sense of humor, joked appropriately, fell right to sleep on Trazodone, did not take naps, felt well rested, and was able to concentrate "for the most part," and that he no longer suffered from hallucinations, had appropriate eye contact, intact insight and judgment, and was meeting most expectations.  *Id.* at 19.  The ALJ did not give great weight to Mr. Osborne's allegations that he was unable to engage in any and all kinds of full-time, competitive, gainful employment on a sustained basis.  *Id.* at 19.  The ALJ also did not give great weight to the statements given by Mr. Osborne's girlfriend as, although the ALJ believed that there was genuine concern for Mr. Osborne's well-being, she doubted the ability of Trudell to be objective.  *Id.* at 19.

The ALJ found that Mr. Osborne was capable of performing light to heavy work that is unskilled, including past relevant work as a laundry worker and cleaner.  *Id.* at 19. Based on the fact that Mr. Osborne was a younger individual age 18-49 at the alleged onset of disability date, had at least a high school education, and was able to communicate in English, the ALJ concluded that Mr. Osborne was also capable of

working as a linen room attendant, warehouse worker, or order picker as defined by the Dictionary of Occupational Titles and reported by a vocation expert testifying at Mr. Osborne's hearing.  *Id.* at 19, 20.  All of these positions were considered to exist in significant numbers in the national economy.  *Id.* at 20.

Osborne requested review of the ALJ's decision on November 21, 2012.  On November 22, 2013, Mr. Osborne's request for review of the ALJ's decision was denied by the Appeals Council.

## II. STANDARD OF REVIEW

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004) (quoting *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (citing *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)), *see also Harris v. Barnhart,* 356 F.3d 926, 928 (8th Cir. 2004) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).  Under this standard, substantial evidence means something "less than a preponderance" of the evidence, but "more than a mere scintilla."  *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003)); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); accord *Ellison v. Sullivan*, 921 F.2d 816, 818 (8th Cir.1990).  "Substantial evidence is *relevant evidence* that a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Perkins*, 648 F.3d at 897 (emphasis added) (citing *Medhaug*, 578 F.3d at 813).

In determining whether the evidence in the record as a whole is substantial, the court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007) (quoting *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)).  If the court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision because the record also contains substantial evidence that supports a different outcome or because the court would have decided the case differently.  *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).

### III.  DISCUSSION

### A.  Law

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  Further, "if a plaintiff's symptoms are controlled or treatable with medication, the plaintiff cannot be considered disabled." *Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) (citing *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004)).

A claimant is disabled when the claimant is "not only unable to do his previous work but cannot, considering  his age, education, and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy . . . either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).  If a claimant suffers from an impairment that is included in the listing of presumptively disabling impairments ("Listings"), or suffers from

an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. *Singh*, 222 F.3d at 451 (citing *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984).

To determine whether or not a disability exists and meets the requirements of the SSA, an ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by Social Security regulations. The ALJ examines any current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. 20 C.F.R. § 404.1520(a). *See Singh*, 222 F.3d at 451 (8th Cir. 2000) (citing *Braswell*, 733 F.2d at 533). In this five-step process, the ALJ first considers any work activity of the claimant. 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is involved in substantial gainful activity, they cannot be found disabled. *Id.* Second, the ALJ considers the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). In order for an impairment to meet the requirements in this step, the duration requirement of 20 C.F.R. § 404.1509 must be met. *Id.* 20 C.F.R. § 404.1509 requires that the impairment "must have lasted or must be expected to last for a continuous period of at least 12 months," or it must be expected to result in death. If this duration requirement is not met, the ALJ will determine that the claimant is not disabled. *Id.* If the duration requirement is met, the ALJ will move to step three.

At the third step in the process, the ALJ determines whether the impairment meets or equals one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds that this step is met, the claimant is found disabled. *Id.* If the impairment is found not to meet or equal one of the listings, the ALJ moves to step four. *Id.* At the fourth step, the ALJ considers assessments of residual

functional capacity and past relevant work of the claimant to determine if the claimant is able to perform their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is able to perform their past relevant work, the ALJ will find that the claimant is not disabled.  *Id.*

If the claimant is not able to perform their past relevant work, the ALJ moves to step five and assesses whether the claimant may be able to perform other work. 20 C.F.R. § 404.1520(a)(4)(v).  However, "if the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity ("RFC") to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy."  See 20 C.F.R. § 404.1520(a); *Singh*, 222 F.3d at 451 (citing *Braswell*, 733 F.2d at 533).  "A claimant's residual functional capacity is a medical question."  *Id.*  RFC is defined as the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule.  SSR 96-8P, 1996 WL 374184 (July 2, 1996).  RFC is what an individual can still do despite her impairments and the resulting limitations.  *Id.*  An ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace."  *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).  While RFC is a medical question, RFC is not based solely on "medical" evidence.  *See Nevland*, 204 F.3d at 858; *see also McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) and *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (holding that the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical

records, observations of treating physicians and others, and an individual's own description of the limitations). If the claimant is able to perform other work, the ALJ will find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is not able to perform other work, the ALJ will find that the claimant is disabled. *Id.*

When performing their analysis, the ALJ is entitled to rely on the opinions of reviewing physicians when considering whether the claimant meets the requirements of a listed impairment. *Ostronski v. Chater*, 94 F.3d 413, 417 (8th Cir.1996). Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion. *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)). "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence'" on the record. *Johnson v. Astrue*, 628 F.3d 991, 994 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2) (2012)). However, the SSA has ruled that "the adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion." *SSR 96-2p, 1996 WL 374188 (July 2, 1996)* at *2. The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)), *see also Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir.2004) (stating that "a treating physician's opinion deserves no greater

respect than any other physician's opinion when the opinion consists of 'nothing more than vague, conclusory statements.'").

According to the SSA, the judgment of a physician or psychologist designated by the Commissioner on the issue of whether a claimant has impairments that equal a Listing must be received into the record as expert opinion evidence and given appropriate weight. SSR 96-6p, 1996 WL 374180 (July 2, 1996) at *3.  Further, those opinions may be entitled to greater weight than the opinions of treating or examining sources.  *Id*.; *Richardson v. Astrue*, 2011 WL 4479215 (E.D. Ark. Sept. 28, 2011). Additionally, the opinions of a treating physician may be discounted when they are inconsistent with the overall assessment of the physician or the opinions of other physicians, "especially when those opinions are supported by more or better medical evidence."  *Id*.  (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013-14 (8th Cir.2000)); *Merckling v. Astrue*, 2012 WL 13706 (E.D. Mo. Jan. 4, 2012).

An ALJ cannot substitute his opinion for medical opinions.  *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008) *(*quoting *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990)).  Additionally, "in instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints *solely* on the basis of such personal observations."  SSR 96-8p, 1996 WL 374184 (July 2, 1996); *see also*: *Polaski v. Heckler*, 739 F.2d 1320, 1322 (1984), *Olson v. Astrue*, Civ. No. 11-3491, 2012 WL 6861346 at *15 (D.Minn. Dec. 19, 2010), *Goff v. Barnhart*, 421 F.3d 785, 792, *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir. 1992).

To assist an ALJ in making a disability determination, a VE is many times asked a hypothetical question to help the ALJ determine whether a sufficient number of jobs

exist in the national economy that can be performed by a person with a similar RFC to the claimant. A hypothetical question is properly formulated if it incorporates impairments "supported by substantial evidence in the record and accepted as true by the ALJ." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). A VE's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (citing *Porch v. Chater*, 115 F.3d 567, 572-73 (8th Cir. 1997) and *Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996)). Courts apply a harmless error analysis during judicial review of administrative decisions that are in part based on hypothetical questions. For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. See *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

The ALJ has a duty to fully develop the record before making a determination to either award or deny benefits. *Snead v. Barnhart*, 360 F.3d 834, 838 (2004). This includes ensuring that the record includes evidence addressing impairments from either a treating or examining physician. *Id*. Additionally, the duty to develop the record may include seeking clarification when evidence in the record is either unclear or contradictory. *Smith v. Barnhart*, 435 F.3d 926, 930 (2006). A failure by the ALJ to fully develop the record is generally cause for remanding the decision in order for the ALJ to have the opportunity to complete the record.

A claimant is not disabled if alcohol or drug addiction is a contributing factor to the disability.  42 U.S.C. § 423(d)(2)(c).  This alleged dependence was not an aspect of the denial by the ALJ and the record supports only a minimal and sporadic pattern of current use by Mr. Osborne.  Filing No. 9-2; Filing No. 9-7; Filing No. 9-8.  "A claimant's occasional maladaptive use or a history of occasional prior maladaptive use of alcohol or illegal drugs does not establish that the claimant has a medically determinable Substance Use Disorder."  SSR 13-02p, 2013 WL 621536 (Feb. 20, 2013) at *3.  If a claimant is found to have a Substance Use Disorder, the ALJ must make a finding of whether or not the disorder is material or immaterial to the disability. 20CFR 404.1535 and 416.935." SSR 13-02p, 2013 WL 621536 (Feb. 20, 2013) at *2.  A disorder is immaterial if "the claimant would continue to be disabled if he or she stopped using drugs or alcohol." *Id.*

### B.  Analysis

This court finds there is not substantial evidence in the record to support the ALJ's findings. In her review of Mr. Osborne's case, the ALJ used her own personal observations, selective portions of an incomplete record, and improper determinations of credibility to arrive at her decision. Based on the information presented through Mr. Osborne's medical records and the analysis conducted by the ALJ, the ALJ has not met her burden to show that Mr. Osborne was capable of working in any capacity.

The ALJ improperly relied on certain testimony to draw a conclusion that the whole of the testimony does not support.  For example, the ALJ states that because Mr. Osborne can go to the grocery store, he is able to function in select social situations. Filing No. 9-2 at 15.  She fails to consider his unrefuted testimony that he only goes

once a month in the middle of the night when the least amount of people are going to be there. *Id.* at 12.  She also uses the fact that Mr. Osborne rides the bus once a month to go to an appointment at Catholic Charities and plays video games every few weeks with a friend to mean that he can interact on a social level and maintain concentration.  *Id.* at 16-17.

The ALJ also made an improper determination of credibility regarding Mr. Osborne's own statements.  Mr. Osborne's personal statements regarding intensity, persistence, and limiting effect of his symptoms were found to be inconsistent with the residual functional capacity assessment made by the ALJ.  Filing No. 9-2 at 17. However, in order to arrive at this assessment, the ALJ used the above statements made by Mr. Osborne to determine that his impairments do not meet the requirements of any of the listings.  *Id.* at 15.

The ALJ gives weight to the findings of two non-examining mental health practitioners that both conclude that Mr. Osborne will continue to improve and that he is capable of working, but does not consider the opinions, fully supported by the record, of the SSA's own consulting examiner and the claimant's treating mental health practitioner.  Filing No. 9-2 at 17.  Dr. Milne's PRT is not reasonably supported by the record.  Though ostensibly based on Dr. Fix's consulting exam, Dr. Milne's report in fact mischaracterizes and contradicts Dr. Fix's findings.

In his findings, Dr. Milne indicated that "a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." Filing No. 9-7 at 288, 290.  Yet the symptoms reported by Dr. Fix upon which Dr. Milne based his review did meet at least four of the criteria required for Depressive syndrome, including: sleep

disturbance (Filing No. 9-7 at 280: "I don't sleep more than five hours" at night.  He always awakes before he wants to.; Filing No. 9-7 at 280-281: he probably is not getting enough sleep), feelings of guilt or worthlessness (Filing No. 9-7 at 278: "I still feel like crap"), difficulty concentrating or thinking (Filing No. 9-7 at 281: the claimant has difficulty sustaining concentration and attention), and hallucinations, delusions, or paranoid thinking (Filing No. 9-7 at 278: "I feel people staring at me."  He hears voices in his head, and he is convinced that people are talking about him).  *Id.* at 288.  Additionally, only one requirement must be met to diagnose an anxiety-related disorder, one of which is "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress."  *Id.* at 290.  Mr. Osborne reported to Dr. Fix that he had "repeated flashbacks, all without triggers."  *Id.* at 278.

Further, Dr. Milne found that Mr. Osborne had no difficulties in maintaining concentration, persistence, or pace, despite Dr. Fix's findings to the contrary.  Dr. Fix explicitly stated that Mr. Osborne had difficulty sustaining concentration and attention. *Id.* at 295, 281.  Dr. Milne relied upon a third-party report that Mr. Osborne visited a few friends and went fishing, but failed to consider Mr. Osborne's girlfriend's statements that Mr. Osborne only visited with friends who came to their apartment.  *Id.*  The record does, however, substantiate Dr. Fix's findings.

The ALJ relied on progress notes made by Langdon to validate Dr. Milne's assessment that Mr. Osborne's condition would not last 12 months.  Additionally, the ALJ emphasized that Mr. Osborne's hallucinations did not prevent him from working, as was evidenced by the fact that Mr. Osborne reported having suffered from the hallucinations his whole life and still had periods of gainful employment.  Although there

is an indication that Mr. Osborne's depression was decreasing through treatment, there is no indication that his anxiety level decreased.  *Id.*  At his last appointment reported by Langdon, Mr. Osborne indicated that his anxiety level and paranoia were still high. Filing No. 9-8 at 351.  Therefore, the improvement relied upon by the ALJ to determine that Mr. Osborne's condition had not lasted twelve months was for an aspect of his condition, his hallucinations, that the ALJ had previously stated did not prevent him from working.  Filing No. 9-2 at 17, 18.  The aspect of his condition that does prevent Mr. Osborne from working, his high level of anxiety, showed no improvement over the thirteen month course of treatment. Filing No. 9-7; Filing No. 9-8.

In relying heavily on the progress notes made and GAF score assigned by Langdon, the ALJ erred by not appropriately assessing the weight of the treating and examining sources.   At the July 2011 examination by Dr. Fix, who was the Commission's own expert, Mr. Osborne was given a GAF score of 30 and no more than 40. Filing No. 9-7 at 281.  Dr. Fix stated that "there might be some conditions in which the claimant could work under ordinary supervision, but . . . his explosiveness would make this really difficult," and that Mr. Osborne was "very mentally ill."  *Id.*  Mr. Osborne remained untreated until his initial visit with Catholic Charities in September.  On intake his condition was no different than the one described by Dr. Fix.  However, both evaluators at Catholic Charities gave him different GAF scores, Vasarkovy a 40 on September 6 and Langdon a 50 on September 14.  His medical regimen was not initiated until September 14 as evidenced by his emergency room visit on September 18, 2011.

The progress notes made by Langdon and her GAF assessment of Mr. Osborne are, as a whole, consistent with the findings of Dr. Fix.  Although some changes in assessment is expected over time which may show improvement, the inconsistencies within Langdon's own notes do not undermine the medical strength of her findings that Osborne's condition did not substantially change throughout the course of his treatment. His GAF and mental health diagnosis never substantially changed. *See* Filing No. 9-7; Filing No. 9-8.

While questioning the VE at Mr. Osborne's hearing, the ALJ posed hypothetical questions that assumed that Mr. Osborne had the ability to maintain attention and concentration for task completion and that he was able to interact adequately with coworkers and supervisors.  There is not, however, substantial evidence in the record to support such an assumption.   Although according to Langdon, Mr. Osborne's concentration was improving, the RFC completed in November 2011 by Langdon indicated that Mr. Osborne was moderately to markedly limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and markedly limited in the ability to maintain attention and concentration for extended periods.  The hypotheticals suggested by Mr. Osborne's attorney, however, were based upon the evaluation conducted by Dr. Fix as well as substantiated by Langdon's RFC and treatment notes. Filing No. 9-7; Filing No. 9-8.  Because the testimony made by the VE was based upon a correctly phrased hypothetical posed by Kessell using the exact language of Dr. Fix's analysis and Langdon's RFC, the findings of the VE that there "would be no such jobs such a person could perform" may be considered substantial evidence that Mr. Osborne is in fact disabled.  *Taylor*, 118 F.3d at 1278; Filing No. 9-2

at 49.    Additionally, the ALJ based her decision partially on her own personal observations during the hearing. Filing No. 9-2 at 16.

In his brief, the plaintiff argues that there is improper weight placed on the GAF scores.  Filing No. Filing No. 12.  Each physician that Mr. Osborne saw assigned him a different GAF score, ranging from 30 to 55. Filing No. 9-7 281, 335, 322, 366. Langdon's initial GAF score for Mr. Osborne was 50, and increased in March 2012 to 55. Filing No. 9-7 at 322, 366.  At the March appointment, however, Mr. Osborne's progress was reported by Langdon to be unchanged. *Id.* at 366.  Langdon's GAF scores throughout Osborne's treatment are either 50 or 55.  Her Residual Function Test findings of moderate to marked disability were made simultaneous with her GAF scores of 50-55.  The court agrees that improper weight was placed on the difference between treating physician GAF scores.

The SSA argues in its response to the appeal that Mr. Osborne is not eligible for benefits, because his condition is a result of a cannabis dependency. Filing No. 13. Because the use of marijuana by Mr. Osborne is sporadic at best, it does not constitute a Substance Use Disorder.  Even if he was determined to have such a disorder, the use of the drug is not material to the condition and, as shown through Landon's treatment notes, the condition does not change when the drug is removed.  Filing No. 9-7; Filing No. 9-8.

## IV.  CONCLUSION

For all of the reasons found above, this court finds that the determination of the ALJ to deny benefits is not supported by substantial evidence.  "Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt

of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan,* *957 F.2d 611, 614 (8th Cir. 1992).* The evidence presented by Dr. Fix and the testimony of the VE based upon the report of Dr. Fix provide sufficient evidence for this court to make a determination that Mr. Osborne is in fact disabled. Because remanding the case to the ALJ for further development would only delay the ability of Mr. Osborne to receive benefits, this court finds it appropriate to reverse the decision of the ALJ and award benefits to Mr. Osborne.

THEREFORE, IT IS ORDERED that the decision of the ALJ, and thereby the Commissioner, is reversed and this action is remanded for an award of benefits. A separate judgment will be entered in accordance with this memorandum and order.

Dated this 6th day of March, 2015.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge